## A96A2094. DOOLEY v. DUN & BRADSTREET SOFTWARE SERVICES, INC.
### (483 SE2d 308)

SMITH, Judge.

James F. Dooley, Jr. filed suit against his former employer, Dun & Bradstreet Software Services, Inc., d/b/a D & B Software (D & B), seeking damages under theories of breach of contract, promissory estoppel, and quantum meruit. Dooley claimed he was entitled to more compensation than was paid under an employee bonus incentive plan. D & B moved the court for summary judgment, and Dooley moved for partial summary judgment. The trial court granted D & B's motion and denied that of Dooley, and this appeal ensued.

The record reveals that in 1993 Dooley was employed as the Field Program Manager for the Southern Region and Latin America. He was notified that he had been selected to participate in the company's 1993 annual incentive plan for employees. The plan set forth certain goals for employees and provided for bonus compensation for achieving or exceeding those goals. Bonus calculations were weighted, with ninety percent of the bonus entitlement dependent upon revenue attributable to the region for which Dooley was the Field Program Manager and ten percent dependent upon overall operating revenue. Dooley does not dispute that portion of his bonus attributable to overall operating revenue.

His claim is that the portion of his bonus dependent upon regional revenue was underpaid. It is undisputed that Dooley exceeded his 1993 regional revenue goal by 263 percent. He received a bonus of $74,520 attributable to software license revenue from the Southern Region, in addition to his base salary of $96,600. This

amount was the bonus payable for achieving 140 percent of goal, which was the highest amount indicated on the table shown on the Participant Summary.

1. The Participant Summary contains a table indicating the targeted goals and the bonuses applicable for reaching or exceeding them. Dooley's goal for Southern Region/Latin American Smart-stream License Revenue was $1,843,000 for 1993. The Participant Summary sets forth the bonus awardable for reaching 65, 80, 100, and 140 percent of this revenue goal. A note at the bottom of the table recites that "[a]ll awards will be interpolated and extrapolated for performance between specified performance levels."

The primary issue in this appeal centers upon that language. D & B argues that the relevant language places a "cap" upon that portion of Dooley's bonus dependent upon regional license revenue at 140 percent of goal, which is the highest level of performance for which bonus payout is indicated on the table; Dooley contends that no cap is indicated by the Participant Summary. The trial court agreed with D & B. Dooley argues that the trial court erred because the plan's language is ambiguous regarding bonuses for amounts greater than 140 percent of goal, but applying the rules of contract construction resolves the ambiguity in his favor or, at the very least, leaves the ambiguity for jury resolution.

Contract construction involves a three-step process. The court must first determine whether the contract is ambiguous; if it is, the applicable rules of construction must be applied. Only if an ambiguity remains after applying the rules of construction does a jury resolve the ambiguity. *Gram Corp. v. Wilkinson*, 210 Ga. App. 680, 681 (437 SE2d 341) (1993).

We agree with Dooley that the sentence in question is ambiguous because it is internally inconsistent. It is clear from the Participant Summary that if Dooley's performance level fell between two of the figures set forth explicitly on the table, his bonus would have been "interpolated" from the two figures surrounding his actual performance level. But the usual and ordinary meaning of the word "extrapolate" is "to estimate or infer (a value, quantity, etc. beyond the known range) on the basis of certain variables within the known range, from which the estimated value is assumed to follow." Webster's Unabridged Dictionary (2nd ed. 1983). It is therefore not possible to "extrapolate" Dooley's bonus *between* specified performance levels"; the actual performance level exceeds the highest level specified on the table. Because a dispute exists regarding how to resolve this inconsistency, the sentence is ambiguous.

Even ambiguous contracts, however, are to be construed by the court. No jury question is presented unless the ambiguity remains after applying the applicable rules of contract construction. *Campos*

*v. Williams*, 217 Ga. App. 296, 298 (457 SE2d 243) (1995). This is true even though the contract may be difficult to construe. *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 256 (2) (381 SE2d 322) (1989). Dooley raises several arguments aimed at demonstrating either that the ambiguity is resolved in his favor by applying various rules of contract construction or that, at the very least, an ambiguity remains after applying these rules so that a jury must decide the issue.

We need not address whether Dooley's arguments relating to application of the rules of contract construction have merit because we conclude that the trial court properly granted D & B's motion for summary judgment for a different reason. The cardinal rule of contract construction is to determine the intent of the parties. It is the parties' intent at the time the contract is made that governs; if the language of a contract may be understood fairly in more than one way, it should be construed to reflect the sense in which the parties themselves understood it at the time of execution. Extrinsic evidence is admissible to establish that understanding. *Gans v. Ga. Fed. Sav. &c. Assn.*, 179 Ga. App. 660, 662 (1) (347 SE2d 615) (1986). When parties disagree as to their intent upon entering an agreement, the meaning placed upon the contract language by one party and known to be thus understood by the other party at the time shall be held as the true meaning. OCGA § 13-2-4; *Lothridge v. First Nat. Bank &c.*, 217 Ga. App. 711, 714 (3) (a) (458 SE2d 887) (1995). The record in this case demonstrates that Dooley signed the contract to participate in the employee incentive plan after he became completely aware that D & B intended to limit bonus awards under the plan.

Dooley was notified by his manager, Dave Gould, D & B's Vice President of Program Management, in late May 1993, before he even received a copy of the plan, that it incorporated a cap on his bonus earnings. Shortly thereafter, Dooley received a copy of the plan and met with Gould for 30 to 45 minutes. During that meeting, Dooley informed Gould that he found nothing in the written plan that indicated a cap on his bonus earnings and that he therefore disagreed with the cap. Gould maintained D & B's position that a cap was imposed under the plan as written. At that meeting, Dooley stated he would sign the agreement despite his unhappiness with a cap because he was "a good corporate citizen" and because it was not an issue for him at that time; he did not yet know whether he would even reach the revenue threshold beyond which his bonus would be capped. He signed the plan that day. Dooley admits he met with Gould and others several other times during the course of 1993, and that at no time did Gould or D & B ever retract or change its position that the plan capped bonus earnings at 140 percent of goal.

Dooley clearly signed the contract with full knowledge that D & B's intention in offering the plan was to cap bonus earnings at

the amount applicable to achievement of 140 percent of goal. Although Dooley may have felt it was not an issue for him on the day he signed it, he could not sign the contract with a full understanding of D & B's intent with regard to the bonus and then dispute that intent later, when it became an issue because of his own subsequent performance. Because Dooley knew and understood at the time he signed the contract that D & B intended to cap his bonus earnings should his performance exceed 140 percent of the targeted goals, D & B's interpretation is the one we must place upon the language in the plan summary despite its facial ambiguity. The trial court therefore did not err in granting summary judgment to D & B despite the ambiguity in the plan's language. *Lothridge*, supra.

2. Dooley also contends the trial court erred in granting summary judgment in favor of D & B because genuine issues of material fact remain for jury determination with regard to his claims for breach of contract, promissory estoppel, and quantum meruit. We do not agree.

With regard to breach of contract, Dooley's claim is predicated upon his insistence that the plan called for an unlimited bonus. Because we have concluded in Division 1 that D & B's interpretation must be used in construing the plan language and D & B interprets the plan as capping the bonus, this contention is without merit.

3. We disagree with Dooley's contention that he has established all the elements of his claim under a theory of promissory estoppel. To establish his claim under this doctrine, Dooley was required to show (1) that D & B promised to pay him an unlimited bonus; (2) that D & B expected him to rely on that promise; (3) that he did, in fact, rely upon it; and (4) that injustice may be avoided only by enforcing D & B's promise. OCGA § 13-3-44 (a); *Fidelity & Deposit Co. v. West Point Constr. Co.*, 178 Ga. App. 578, 579 (1) (344 SE2d 268) (1986).

Dooley has failed to demonstrate that D & B ever actually *promised* him an unlimited bonus or that he relied to his detriment upon such a promise. In fact, the record demonstrates that D & B told Dooley he would *not* receive an unlimited bonus and that Dooley signed the agreement knowing this, at least partly because he did not yet know whether he would reach the cap threshold. The trial court did not err in granting summary judgment to D & B on this ground.

4. A claimant may not recover under the theory of quantum meruit when an express contract covers all the claimed rights and responsibilities of the parties. *Lord Jeff Knitting Co. v. Lacy*, 195 Ga. App. 287, 288 (2) (393 SE2d 55) (1990). Both parties agree that an express contract covered the issue of Dooley's bonus; they disagree only as to the interpretation of that contract. The trial court did not err in granting summary judgment in favor of D & B on this ground.

5. The denial of Dooley's motion for partial summary judgment was proper for the same reasons the grant of D & B's motion for summary judgment was proper.

*Judgment affirmed. Andrews, C. J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED FEBRUARY 14, 1997 —
RECONSIDERATION DENIED MARCH 4, 1997.

*Kaufman & Chaiken, Fredric Chaiken*, for appellant.
*Paul, Hastings, Janofsky & Walker, Weyman T. Johnson, Jr.*, for appellee.